IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **WARREN K. GLADDEN** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. **PJM 10-1793** |
| | * | |
| **JOHN McHUGH,** | * | |
| **Secretary, U.S. Dep't of the Army** | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM OPINION**

Warren K. Gladden, *pro se*, has filed this suit against John McHugh, Secretary of the United States Department of the Army ("Army"), based on his ultimately unsuccessful application for employment with the Army Research Laboratory ("ARL"), an Army sub-organization based in Adelphi, Maryland. He alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34 ("ADEA").[1]

The Army has filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. [Paper No. 18]. Because the Army has cited evidence outside the four corners of the Complaint, the Motion will be treated as a Motion for Summary Judgment. *See* Fed. R. Civ. P. 12(d). For the following reasons, the Army's Motion for Summary Judgment is **GRANTED**.

---

[1] Gladden is a frequent filer in this Court, typically alleging race and age discrimination in connection with unsuccessful applications for federal employment. *See Gladden v. Locke*, 2011 WL 2619570 (D. Md. June 30, 2011); *Gladden v. Locke*, 2011 WL 2160573 (D. Md. May 31, 2011); *Gladden v. McHugh*, Civ. No. PJM 10-3402 (D. Md.).

1

# I.

From May 25, 2007 to June 26, 2007, ARL advertised a vacancy for a "General Engineer/Physical Scientist" position.[2] The selectee would serve as the Associate Director for Programs and Plans within the Office of the Director. The vacancy announcement listed a number of requirements for the position, including: expertise, knowledge and skills in a number of fields relevant to ARL's business areas, such as "weapons, materials, sensors, electron devices, human research and engineering, . . . modeling and simulation of complex systems and external basic research focusing on future technology for Army transformation"; in-depth experience in at least one of these fields; the ability to manage technical projects and programs; broad-based experience in the scientific, engineering, and mathematical fields relevant to ARL business areas; and one year of experience directly related to the job.

ARL advertised the vacancy through two postings issued by the Office of Personnel Management on the Army's Resume Builder website: NEAC07025926D ("5926D") and NEAC07025926 ("5926"). The 5926D announcement was posted under the Delegated Examining Unit ("DEU") hiring authority and was open to the public. The 5926 announcement was posted under the Merit Assignment Plan ("MAP") and was advertised for current and former federal employees. *Both announcements sought applicants for a single position.* In other words, ARL sought to fill only one position, but solicited applications via two separate avenues—one for all qualified citizens (5926D), and the other reserved exclusively for current and former federal employees (5926).

Gladden, an African-American male born in 1954 and former government employee with a B.S. in physics and an M.S. in electrical engineering, applied for the position through the DEU

---

[2] All the dates in the application process occurred in 2007, such that the year 2007 will not be repeated in the discussion.

posting alone (5926D). His resume included the year he received his undergraduate degree, 1979, but otherwise gave no indication of his age or race. However, Gladden separately submitted personal information, including his age, as part of the application process. As far as the evidence shows, he did not indicate his race anywhere in the application.

ARL received a total of 258 applications, including Gladden's, under the DEU program and 54 applications under the MAP program. Applications under both programs were submitted to an automated screening process that determined which applications would be certified for further consideration. The automated process used a computer program, RESUMIX, to analyze an application's content and assign it a score based on the skills and experience represented in the application's text. All applications exceeding a pre-determined score were certified, while all those below the cutoff score were rejected.

Though both the MAP and DEU programs generally used the same automated scoring process to certify applications, each program employed a slightly different methodology to calculate an application's score. Under the MAP program, applications were searched for any of five potential "required" and "desired" skills. The former category included "Research Experience" and "Technical Management," while the latter included "Basic Research," "Lab Management," and "Engineering Experience." Applications received a score based on the total number of skills matched, with the score range being between zero and five. Under the DEU program, applications were searched for the same skills as the MAP program.[3] However, instead of weighting skills equally, each skill was given a ranking of one to six, six being the most important and one being the least important. After an application was analyzed under this

---

[3] DEU criteria also included a category denominated "Project Management," which did not appear in the MAP criteria.

3

program, it received a score based on the weighted rankings of all the skills. Under this methodology, the DEU scores could range between 70 and 100.

For both programs, the skills, weights and cutoff-scores were defined by Rita McGreevy, an ARL Human Resources Specialist, and John Miller, Director of the ARL. Once the automated scoring process was complete, McGreevy reviewed an internal webpage containing a list of application scores. For each application, the list contained the applicant's name, the application's automated score, and miscellaneous information about the application, such as the date it was submitted. The list did *not* include any information about an applicant's race or age. Each application list item contained a hyperlink to an "Overview" webpage for that application that listed supplemental information, including the applicant's date of birth, but not his or her race. Though McGreevy had access to this "Overview" page for every application, she had no reason to review this page with respect to any application that received an automated DEU score below the cutoff. Gladden's application, which was submitted only under the DEU program, received a score of 85. Because he did not apply under that program, he did not receive a MAP score. On August 21, he was notified that "[his] resume was not referred to the selecting official as [he was] not among the top competitors." Accordingly, per McGreevy's sworn affidavit, she never reviewed the "Overview" page for Gladden's application, which was below the DEU cutoff score.

Of the 258 DEU applications, 19 were certified after meeting the cutoff score of 90, and 6 were ultimately referred to the next round after review. Of the 54 MAP applications, 29 were certified after meeting a cutoff score of 3, and 14 were ultimately referred to the next round after review. In terms of the races and ages of the applicants under both programs, the datasets provided by Gladden and the Army's Equal Employment Opportunity Office ("EEO") are generally complementary but do not entirely agree. According to Gladden's data, none of the 20

4

African-American applicants under the DEU program were referred (0%), whereas 4 of the 122 white applicants were referred (3%). Also, according to Gladden, 1 of the 5 African-American applicants under the MAP program was referred (20%), whereas 12 of the 38 white applicants were referred (32%). The EEO reports that 26 African-Americans and 163 whites applied under the DEU program, but the races of the referred applicants are undisclosed. As for the MAP program, the EEO report shows that 1 African-American and 12 white applicants were referred, but the racial composition of the total applicant pool is also unknown.

With respect to age, Gladden's data show that 84% of the referred applicants under the DEU program were over the age of 40, compared with 60% of the total applicant pool, and that 93% of the referred applicants under the MAP program were over the age of 40, compared with 90% of the total applicant pool. The age data from the EEO report appear to be incomplete. While the age distribution of the 6 referred applications under the DEU program is unknown, the data show that 69% of the total applicant pool was over the age of 40. Additionally, while the age distribution of the total applicant pool under the MAP program is unknown, the data show that 93% of the 14 referred applicants were over the age of 40.

The ultimate selectee for the position, Cary Chabalowski, is a white male born in 1950, approximately four years *before* Gladden. Chabalowski, who was an ARL employee when he submitted his application, applied under both the DEU and MAP programs. Because he received an automated score of 83 on his DEU application, he was not certified under that program.[4] However, he received an automated score of 3 on his MAP application and was ultimately referred under that program.

---

[4] According to McGreevy, after the position was filled, it was discovered that the DEU applications were erroneously scored based on a mistake in the weights assigned to the criteria. Under the corrected weightings, Gladden received a DEU score of 84 (still below the cutoff score of 90) and Chabalowski received a DEU score of 96.

5

On November 19, Gladden filed a claim with the EEO alleging discriminatory non-hiring based on age and race. On December 13, his complaint was accepted for investigation. On March 18, 2008, a fact-finding conference was held. On June 10, 2008, Gladden filed a request for an Equal Employment Opportunity Commission ("EEOC") hearing. Approximately one year later, on May 6, 2009, he withdrew his request for a hearing. On July 2, 2009, he received the EEO's final decision rejecting his complaint and one month later, on August 3, 2009, he appealed the decision to the EEOC. Not having received a decision on the appeal within 180 days, he filed the instant lawsuit on July 2, 2010.[5]

**II.**

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

---

[5] In his papers, Gladden makes fleeting references to potential claims of retaliation and violation of the Civil Service Reform Act. However, he only filed two employment-related claims with the EEO—namely, the two claims at issue in this complaint. All other claims would be subject to the administrative exhaustion requirement before they could be addressed by this Court.

6

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**III.**

Gladden alleges race and age discrimination in violation of the 1964 Civil Rights Act and the ADEA, respectively. As plaintiff, he has the burden of establishing discriminatory intent as to both claims. This burden can be met either by presenting direct evidence of discriminatory animus, *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988), or through the indirect burden-shifting proof scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See also Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004) (applying *McDonnell Douglas* framework to ADEA claims). Because Gladden has offered no direct evidence of discriminatory animus, his claims are properly analyzed under the three-part *McDonnell Douglas* framework.[6] *See Mereish*, 359 F.3d at 334.

Under *McDonnell Douglas,* to justify an inference of discrimination, the plaintiff must first establish a *prima facie* case of discrimination. *Id.* The central focus of the inquiry is whether the employer has treated some people less favorably than others because of a protected status,

---

[6] Though Gladden's Complaint contains statistics and other data normally associated with disparate impact claims, he concedes in his Response to Defendant's Motion [Paper No. 24] that he is only making a disparate treatment claim. The Court notes that Gladden has filed a separate lawsuit against the Army alleging disparate impact in its hiring practices (*Gladden v. McHugh*, Civ. No. PJM 10-3402 (D. Md.)).

7

such as age or race. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978) (quoting *Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977)).

If the plaintiff establishes a *prima facie* case, a presumption of discrimination arises, which the employer may rebut by articulating a legitimate, non-discriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). The employer's burden is merely one of production, not persuasion. *Id.* at 255-56. If the employer meets this burden, the presumption raised by the plaintiff's *prima facie* case is rebutted and the factual inquiry proceeds to a "new level of specificity." *Id.* at 255.

At that juncture, the plaintiff must prove that "the legitimate reasons offered by the agency were not its true reasons, but were a pretext for discrimination." *Id.* at 253; *see also Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir.1989). To support a finding of pretext, a plaintiff must demonstrate that the hirer's articulated reasons have no basis in fact or that its reasons were not the "real" reason for the adverse employment action. *See Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). To meet his burden of proving that the company's explanation is pretextual and that he was the victim of intentional discrimination, "the plaintiff must establish that he was the better qualified candidate for the position sought." *Evans v. Techs. App. & Serv. Co.,* 80 F.3d 954, 960 (4th Cir. 1996).

The ultimate burden of showing that the employer intentionally discriminated against him remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253. Even if the plaintiff demonstrates a *prima facie* case and sufficient pretext, however, the defendant will still be entitled to judgment as a matter of law if "no rational factfinder could conclude that the action was discriminatory." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000); *see also Gillins v. Berkeley Elec. Coop., Inc.,* 148 F.3d 413, 416-17 (4th Cir. 1998) (explaining that

the plaintiff must develop some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action).

## IV.

Gladden claims he was not hired for the Associate Director position at ARL because of discrimination based on his race and/or age. The Court finds, as a matter of law, that he has not shown this.

### A.

To prove a claim of failure to hire due to race and age discrimination under the *McDonnell Douglas* framework, Gladden must show that (1) he is a member of a protected group; (2) there was an open position for which he applied or sought to apply; (3) he was qualified for the position; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Burdine,* 450 U.S. at 253. The Court finds that Gladden satisfies the first two factors and will assume, *arguendo*, that he satisfies the third.[7] The core issue is whether the fourth prong has been met, i.e., whether Gladden was rejected under circumstances giving rise to an inference of unlawful discrimination.

As indicated, the applicant ultimately selected, Chabalowski, is a white male who was 57 or 58 years of age at the time of the employment decision. Thus, the selectee was outside of Gladden's protected racial class and within Gladden's protected age class.

### B.

With respect to the race discrimination claim, under *McDonnell Douglas* the selection of Chabalowski would seemingly fulfill the fourth element for a *prima facie* showing of employment discrimination. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) (holding that

---

[7] In a case such as this, where the ultimate issue is whether someone else was better qualified than the plaintiff, the third factor to some extent merges into the fourth.

9

selection of an applicant outside the plaintiff's racial class satisfies the fourth prong of the *prima facie* case). However, applying this rule to the present circumstances is problematic, since there is no indication that the selecting officials in this case were in any way aware of Gladden's race at the time of the employment decision. It has been stated many times over that the *McDonnell Douglas* framework should not be applied in a "rigid, mechanized, or ritualistic" manner. *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 611 (4th Cir. 1999). The test, instead, is a means to "fine-tune the presentation of proof and . . . sharpen the focus on the ultimate question— whether the plaintiff successfully demonstrated that the defendant *intentionally* discriminated against her." *Id.* (emphasis added). Quite clearly, then, as a matter of logic, if the selecting officials were unaware of Gladden's race at the time of the employment decision, to apply *McDonnell Douglas* here would be to engage in a formalistic ritual, instead of the practical, flexible approach the Fourth Circuit mandates.

For this reason, the Fourth Circuit has held that the protected status must have *actually* played a role in the employer's decision-making process. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004). For this to be so, there obviously must be some indication that the deciding officials knew of the applicant's status as a protected individual. *See, e.g.*, *Moore v. Reese*, 817 F. Supp. 1290, 1298 (D. Md. 1993) ("It is impossible for an employer, who does not know the race of an employee, to discriminate against that employee."); *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 21 (D.D.C. 2009) (holding that it is "axiomatic that a defendant cannot be found to have discriminated against a plaintiff on the basis of race where the defendant had no knowledge of the plaintiff's race"). Without at least some plausible evidence indicating that at least one of the ARL officials was aware of Gladden's race, his *prima facie* case of race discrimination falters.

Gladden's argument that the Army is *required* to know the race of every applicant, pursuant to the Uniform Guidelines for Employee Selection Procedures ("UGESP"), misses the point.[8] Whether or not the Army in general is required to maintain such data, there is no implication here that the selecting officials themselves had access to such data. But Gladden does not identify where in the application process he submitted information about his race, and the Army credibly claims that no part of the application requested or even accepted such information. Furthermore, none of the exhibits presented by either party makes mention of Gladden's race. But, again, even if Gladden submitted information revealing his race, McGreevy's sworn affidavit indicates that she never reviewed Gladden's application and never knew his race until after Gladden filed his EEO complaint.

Gladden's case authorities do not alter the fact that a hirer cannot discriminate based on an unknown quality. In *E.E.O.C. v. Sears Roebuck*, 243 F.3d 846 (4th Cir. 2001), a current employee of Sears applied for and was denied another position within Sears. *Id.* at 851. In that case, unlike the present one, it could easily be inferred that the plaintiff's employer was aware of his race. Similarly, in *Garrison v. Cambro, Inc.*, 428 F.3d 933 (10th Cir. 2005), which involved an employee applying for a promotion within the same company, *id.* at 936, an inference that the hirer knew of the applicant's protected status was patently obvious. *Sarmiento v. Montclair State University*, 513 F. Supp. 2d 72 (D.N.J. 2007), also involved a current employee applying for a promotion. Finally, in *Brown v. Marriott International*, No. AW-07-1585, 2008 U.S. Dist. LEXIS 121179, at *2 (D. Md. Oct. 31, 2008), the applicant specifically informed the hirer prior to rejection that he was a "minority business owner."

---

[8] Gladden delves into the UGESP, which mandate that public hirers maintain information on the protected statuses of all applicants so as to monitor for any disparate impact. 29 C.F.R. § 1607.4. The alleged failure to do so may, in some instances, result in a rebuttable presumption of discriminatory intent in a disparate impact employment discrimination claim. *Id*. In this instance, however, Gladden is not making a disparate impact claim; he has asserted specific discriminatory treatment on the part of the selecting officials involved in the hiring at issue.

In none of these cases did the court hold that a *prima facie* showing of discrimination may be established where the plaintiff provides no evidence tending to prove the employer had knowledge of the applicant's protected class. Indeed, in *Sears Roebuck* the court stressed that the crux of a failure to hire claim is evidence that the applicant was rejected "under circumstances which give rise to an inference of unlawful discrimination." *Sears Roebuck*, 243 F.3d at 851 (citing *Burdine*, 450 U.S. at 253).

The Court finds that Gladden has failed to demonstrate a *prima facie* case of race discrimination.

## C.

*McDonnell Douglas* is also applicable to ADEA claims. *Mereish*, 359 F.3d at 334. To get beyond summary judgment, Gladden must establish a *prima facie* case of age discrimination, which the defendant can rebut by showing legitimate, non-discriminatory reasons for hiring Chabalowski over Gladden. *See McDonnell Douglas*, 411 U.S. at 802. The burden would then shift back to Gladden to demonstrate that the proffered reasons were in fact a pretext for discrimination. *See id.* The Court concludes that Gladden has failed to show a *prima facie* case of age discrimination under the ADEA.

While the four prongs of the *McDonnell Douglas* test as applied to age discrimination claims are similar to those applied to race discrimination claims, the fourth prong is slightly different. Instead of demonstrating "circumstances which give rise to an inference of unlawful discrimination," *Burdine*, 450 U.S. at 253, Gladden must show, more specifically, that "the position remained open or was filled by a similarly qualified applicant who was *substantially younger* than the plaintiff, whether within or outside the class protected by the ADEA." *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (emphasis added); *see also Nails v. Espy*, Civ. No. DKC 93-3646, 1995 WL 871833 (D. Md. Nov. 2, 1995) (holding that plaintiff failed to establish

*prima facie* case where selectee was three years older than plaintiff). Gladden cannot meet this burden. The eventual selectee for the position, Chabalowski, was at least three years *older* than Gladden. Indeed, Gladden's own data appear to show, instead of bias, a preference for members of his protected age class. All but two of the referred applicants were over the age of 40, and over half were over 50. Because Gladden cannot satisfy the fourth prong of the *McDonnell Douglas* test as applied to age discrimination, he has failed to establish a *prima facie* case of age-related discrimination.

**D.**

Even if Gladden could establish a *prima facie* case of discrimination based on either race or age, the Army could still cite a legitimate, non-discriminatory reason for rejecting him. After that, it would remain for Gladden to prove that "the legitimate reasons offered by the agency were not its true reasons, but were a pretext for discrimination." *Cerberonics, Inc.*, 871 F.2d at 456. To do so, Gladden would have to establish that he was in fact the better qualified candidate for the position. *See Evans,* 80 F.3d at 960.

It is well settled that an employer "has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine*, 450 U.S. at 259. "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans*, 80 F.3d at 960.

Here the record unequivocally shows that the selecting officials performed a thorough and complete review of all applicants. ARL used an automated scoring process to perform an initial evaluation of applications. This process analyzed the content of an applicant's resume and matched it against a predefined list of required and desired skills to assign the application a score. If an application's score was above a predetermined cutoff-score, it was certified for further review. At no point did this automated screening process take any applicant's race into

account. Moreover, there is no evidence that the predetermined criteria or the cutoff-score were selected in a way that negatively affected Gladden or any other applicant because of his or her membership in a protected class.

Using this automated process, ARL certified 48 of the 302 initial applications from both programs and referred 20 of those for further review. There is no evidence that the automated screening process and cutoff scores were administered in a manner that in any way unlawfully discriminated against any applicant. While Gladden may well be disappointed that his application did not meet the cutoff score, this is in no sense evidence of discrimination based on his race or age.

Chabalowski, the applicant ultimately selected, was well-qualified for the position in question. He has a doctorate in chemistry (Gladden does not have a doctoral degree). Further, at the time he applied for the position, Chabalowski was employed by ARL, indeed acting in the position for which he was ultimately hired. Prior to this, he had been a research chemist, specializing in research related to chemical warfare and weapons and materials. He had also served as Deputy Director for Research and Laboratory Management within ARL for two years. This background matched well with the stated requirements of the job, which included "[e]xpertise, knowledge and skills in the scientific, engineering and mathematical fields relevant to ARL's business areas: weapons, materials, sensors, electron devices, human research and engineering, . . . modeling and simulation of complex systems and external basic research focusing on future technology for Army transformation." Moreover, Chabalowski's MAP application met the cutoff score and his DEU application, after being corrected for an error in the weightings, scored 96, well above the cutoff.

Gladden has advanced no evidence showing pretext. As established earlier, since there is no indication that the selecting officials were even aware of Gladden's race at the time of the

decision, there could be no pretext as to race. As for age discrimination, of the twenty applicants originally advanced, eighteen were in Gladden's protected age class, and twelve were over the age of fifty. The fact that so many applicants within Gladden's protected age class advanced to the interview stage conclusively undermines any argument that the reasons advanced for his rejection could have been a pretext for age discrimination. *See, e.g.*, *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (holding that retaining employees comparable in age to the plaintiff weakened an inference of discrimination in employment termination case).

Given Chabalowski's stronger credentials, as well as the absence of any circumstances suggesting that race or age played any role in the Army's hiring decision, the Court finds no basis from which a trier of fact could fairly infer that the reasons advanced by the Army for not hiring Gladden were pretextual. From all that appears, Gladden received a full, fair, and objective evaluation of his application.

## V.

For the foregoing reasons, the Court **GRANTS** Defendant McHugh's Motion for Summary Judgment [Paper No. 18] as to all Counts. Final Judgment will be entered in favor of Defendant McHugh and against Plaintiff Gladden and the case will be **CLOSED**.

A separate Order will **ISSUE**.

                                                  /s/  
                                          **PETER J. MESSITTE**  
**July 13, 2011**                        **UNITED STATES DISTRICT JUDGE**